UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOE McCLELLON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | No. 1:11-cv-01337-SEB-MJD |
| THERMO KING CORPORATION, | ) | |
| TRI-STATE THERMO KING, INC, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

This cause is before the Court on three defense motions: (1) Defendant Tri-State Thermo

King's Motion for Summary Judgment [Docket No. 97], filed on June 19, 2013; (2) Defendant

Thermo King Corporation's Motion for Summary Judgment [Docket No. 100], filed on June 24,

2013; and (3) Defendant Tri-State Thermo King's Motion to Strike Hearsay [Docket No. 112],

filed on August 28, 2013. Because the arguments raised in the briefing of both summary

judgment motions are nearly identical, we resolve these motions, and the related Motion to

Strike, in a combined fashion. For the reasons set forth below, Defendants' motions are all

GRANTED.

**Factual Background**

Plaintiff Joe McClellon was a truck driver employed by Paschall Truck Lines ("PTL")

between June and October 2009. Compl. ¶ 5. Defendant Thermo King Corporation ("the

Corporation") designs, manufactures, and sells temperature control systems for truck cabins,

including the TriPac System, a multi-part heating apparatus designed to enable drivers to warm

their cabins without running the main truck engine. Corp.'s Br. 3. Defendant Tri-State Thermo

1

King, Inc. ("Tri-State") is a regional subsidiary of Thermo King that sells and installs the corporation's systems. Compl. ¶ 11.[1]

In August 2009, PTL assigned Plaintiff to drive Tractor 19303, a brand-new 2010-model Freightliner vehicle. The cabin's "sleeper" compartment was equipped with a TriPac System manufactured by the Corporation and sold and installed by Tri-State. Corp.'s Br. 3. The TriPac System consists of five major components: an Auxiliary Power Unit (APU), a condenser, an evaporator, a diesel fuel fired heater, and an HMI controller. *Id.* The diesel heater component in Plaintiff's cabin was an Airtronic D2, manufactured by Espar Heating Systems; in his cabin, the heater was installed under the bottom bunk of the driver's bunk beds, with its exhaust outlet mounted on the wall near the floor. *Id.* at 4. Slats in the exhaust grill of the heater pointed the outbound air downward. McClellon Dep. 95. Plaintiff did not receive an owner's manual or other instructional material on the correct operation of the TriPac system. *Id.* at 86.

The incident giving rise to this litigation occurred on October 3, 2009, when Plaintiff was in Indianapolis to make deliveries. Plaintiff had gone to sleep in his cabin the previous evening and awoke at 5:00 AM because the cabin had grown cold. He turned on the APU and the heater system, using the HMI controls to set the cabin temperature to 80 degrees Fahrenheit. Corp.'s Br. 5. When Plaintiff awoke three or four hours later, the cabin remained cold, even though he remembers hearing the noises that usually accompany the functioning of the heating system. McClellon Dep. 40. He stood up next to his bed, and after several seconds he noticed a feeling of pressure on his feet, especially his left foot—"like someone standing on my foot." *Id.* at 38. When he looked down to his feet, he saw that the skin on the top of his feet appeared to be "boiling," and that large blisters had formed. In Plaintiff's perception, the heater had suddenly

---

[1] Because neither party has attempted to draw distinctions between the Corporation and Tri-State with respect to their liability, we predominantly refer to them collectively as "Defendants."

emitted a blast of very hot air; when asked how this happened, he responded: "I have no idea. Looked like to me it was a spiritual thing. I don't know. . . . Sound[s] like it was possessed to me." *Id*. at 95–96. After realizing what had happened, Plaintiff moved his feet away from the heater vent and turned off the system.

Several minutes after his feet had been burned, Plaintiff contacted a dispatcher for his employer PTL, and was told that, despite the injury, he was required to make deliveries as scheduled. McClellon Dep. 49, 54. Having wrapped his feet but without seeking further medical attention, Plaintiff undertook the long drive from Indiana to California. Three days later, after having made a scheduled delivery, Plaintiff stopped at Kingman, Arizona, where for the first time he received medical treatment. Dr. Jeremy Barnes, a physician at the medical center who examined Plaintiff, determined that Plaintiff had sustained minor first and second degree burns on his left toes and the top of his left foot. Corp.'s Br. 6 (citing Barnes Dep. 21–22). On his return from this trip to the West Coast, Plaintiff stopped at a PTL maintenance facility in Westminster, Arkansas, to request that the TriPac system be checked. In the time between the accident and his request for maintenance, Plaintiff did not further operate or otherwise use the TriPac system. McClellon Dep. 66.

Plaintiff decided to retire as a driver for PTL in the aftermath of this incident. After his initial medical treatment, he consulted several additional doctors about his foot injuries. Dr. Gregory Gleis, who examined him in September 2010, discovered that two of Plaintiff's toes had required amputation following the accident and that burn-related skin abnormalities in areas of his left foot persisted. Gleis Rep. 6.

Several weeks after the accident, on October 19, 2009, Michael Mills, the maintenance manager for PTL, inspected the TriPac system in Tractor 19303 at the behest of the company. He

testified that his inspection revealed no problems with the auxiliary power unit system. He further asserted that none of the maintenance employees performing regular checks on Tractor 19303 ever detected problems with the system or sustained any burns from the heating vent in the cab. Mills Dep. 6–9. According to Mr. Mills, PTL has received no other complaints of over-heating or injuries in any of the 450 trucks in their fleet in which the TriPac system has been installed. *Id.* at 9.

A considerable time later, on September 21 and November 14, 2012, Mike DeVriendt, the national accounts manager and North America trainer for Espar Climate Systems (the manufacturer of the heating component of the TriPac system) inspected the heater involved in the accident. His inspection revealed that the Airtronic D2 heater installed in Tractor 19303 had never registered a "fault code" in its memory indicating overheating or heating for an unsafe period of time. Corp.'s Br. 6 (citing DeVriendt Dep. 7, 16, 25–32). Based on his inspection, Mr. DeVriendt opined that the heater component had been installed correctly according to his company's guidelines, and that he could not identify any evidence to indicate that the system had malfunctioned. *Id.* Engineer James Casassa was present during the November 14, 2012 inspection and conducted a separate inspection on March 7, 2012. He likewise opined that the system had been correctly installed according to the guidance provided in the TriPac installation manual. He further found that, when the system was set to produce a room temperature of 90 degrees Fahrenheit, the discharge air temperature near the floor-level vent reached approximately 210 degrees; while he found the vent hot to the touch, he reported that air of this temperature did not burn his own skin. Casassa Aff. 1, ¶ 6.

After pursuing a workers' compensation claim for his injuries, Mr. McClellon filed suit in this court on October 3, 2011.

4

## Legal Analysis

### Standard of Review

Summary judgment is appropriate on a claim if the moving party can show that there is no genuine dispute as to any material fact, leaving him entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323 (1986). The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Here, the Defendants as the moving party "bear the initial responsibility of informing the district court of the basis for [their] motion," and identifying those portions of the record which they believe demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Because Plaintiff, the non-moving party, will bear the burden of proof at trial, Defendants may discharge their burden at this stage of the proceedings by showing an absence of evidence to support Plaintiff's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in Plaintiff's favor, if genuine doubts remain and a reasonable fact-finder could find for Plaintiff, summary judgment is inappropriate. *See Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992). But if it is clear that Plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element Anecessarily renders all other facts immaterial.@ *Celotex*, 477 U.S. at 323.

### Discussion

Plaintiff brings claims of strict products liability, negligence, and breach of warranty against Defendants Tri-State Thermo King and Thermo King Corporation. Although he does not fully articulate the specific bases for many of his theories of liability, his strict products liability claim is predicated on a manufacturing defect in the TriPac system, a design defect in the TriPac system, negligent installation by Tri-State Thermo King, and Defendants' failure to provide adequate warning of latent defects.

Under Indiana Law, nearly all of Plaintiff's claims fall within the scope of the Indiana Products Liability Act (IPLA), Ind. Code § 34-20-1-1 *et seq.* The IPLA sweeps broadly, governing all actions that are "(1) brought by a user or consumer; (2) against a manufacturer or seller; and (3) for physical harm caused by a product; regardless of the substantive legal theory or theories upon which the action is brought." Ind. Code § 34-20-1-1.[2] Although the Act was

---

[2] Plaintiff's complaint, as noted above, contains an allegation of negligent installation. The IPLA does not apply to transactions that are wholly or predominantly a "service" rather than sale of a product. *See Baker v. Heye-America*, 799 N.E.2d 1135, 1140 (Ind. Ct. App. 2003). We conclude, however, that the transaction between either of the Defendants and Plaintiff was predominantly the sale of a product, even if the installation of the product (by

originally intended to apply to strict liability suits, legislative amendments have made clear that it governs claims sounding in negligence or breach of implied warranty as well. *See Schultz v. Ford Motor Co.*, 857 N.E.2d 977, 981 (Ind. 2006) (IPLA covers a general negligence claim); *Spangler v. Sears, Roebuck & Co.*, 752 F. Supp. 1437, 1449 (S.D. Ind. 1990) (a breach of implied warranty claim duplicates an IPLA strict liability claim and should not be pursued as a separate count). Plaintiff's count alleging breach of express warranty finds no support in the designated evidence; since Plaintiff has neither established a basis for this claim nor devoted any argument to it in his briefing, we grant Defendants' motion for summary judgment with respect to liability for breach of express warranty. As to his remaining strict liability, negligence, and breach of implied warranty claims, as explained more fully below, Plaintiff can prevail only if he meets the unified liability standard set forth by the IPLA.

The IPLA draws its standard of liability from the language of strict products liability, and the standard applies broadly to all manufacturers and sellers of goods, regardless of whether they are in privity of contract with the injured party. Ind. Code § 33-1-1.5-3(b)(2); *Natural Gas Odorizing, Inc. v. Downs*, 685 N.E.2d 155, 162 (Ind. Ct. App. 1997). The statute provides that:

> [A] person who sells, leases, or otherwise puts into the stream of commerce any product in a defective condition unreasonably dangerous to any user or consumer or to the user's or consumer's property is subject to liability for physical harm caused by that product to the user or consumer or to the user's or consumer's property if:
>
> (1) that user or consumer is in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition;
>
> (2) the seller is engaged in the business of selling the product; and

---

Defendant Tri-State) was incidental to that sale. The negligent installation claim, like the others, must therefore stand or fall within the rubric provided by the IPLA.

> (3) the product is expected to and does reach the user or consumer without substantial alteration in the condition in which the product is sold by the person sought to be held liable under this article.

Ind. Code § 34-20-2-1. Defendants do not dispute that both of them are in the business of selling the TriPac system installed in Plaintiff's truck cab; neither do they dispute that Plaintiff as a truck driver is a foreseeable user of their product. It also is clear that the TriPac system installed in Trailor 19303 was assembled by Thermo King Corporation and sold and installed by Tri-State Thermo King; both Defendants are thus properly responsible for the unit's condition at the time it was put into the "stream of commerce" and delivered to Plaintiff's employer. *See* Corp.'s Br. 3.

Thus, while there is no question that Defendants are proper parties to this Indiana products liability suit, it remains to be determined whether the product that allegedly injured Plaintiff was "in a defective condition unreasonably dangerous to any user." Ind. Code § 34-20-2-1. In interpreting this language, Indiana courts have concluded that "[t]he requirement that the product be in a defective condition focuses on the product itself[,] while the requirement that the product be unreasonably dangerous focuses on the reasonable expectations of the consumer." *Welch v. Scripto-Tokai Corp.*, 651 N.E.2d 810, 814 (Ind. Ct. App. 1995). A product is "defective" if it is in a condition not contemplated by reasonable members of its class of expected users; it is unreasonably dangerous if it poses a risk of harm beyond the expectations of an "ordinary consumer who purchases it with the ordinary knowledge about the product's characteristics." Ind. Code §§ 33-1-1.5-2.5; 33-1-1.5-2. The criterion of unreasonable dangerousness is context-dependent, and a product may be "dangerous" in the ordinary colloquial sense while still not triggering strict liability. For example, while a loaded weapon is manifestly dangerous if handled by a child, it is not "unreasonably dangerous" so long as it

8

functions properly for its intended purpose. *See Smith v. AMLI Realty Co.*, 614 N.E.2d 618, 622 (Ind. Ct. App. 1993).

Under the IPLA, there are three means by which a plaintiff may establish that a product is defective: he may point to "a manufacturing flaw, a defective design, or a failure to warn of dangers in the product's use." *Baker v. Heye-America*, 799 N.E.2d 1135, 1140 (Ind. Ct. App. 2003); *Downs,* 685 N.E.2d at 161. A manufacturing defect claim proceeds according to strict liability principles. Ind. Code § 24-30-2-1; *Yasuda Fire & Marine Ins. Co. of Am. v. Lake Shore Elec. Corp.*, 744 F. Supp. 864, 866 (S.D. Ind. 1990). A design defect or failure to warn claim, however, cannot be proved without establishing the defendant's negligence. *See* Ind. Code § 34-20-2-2 (providing that claimants must show that the "manufacturer or seller failed to exercise reasonable care under the circumstances"). Plaintiff asserts that Defendants are liable under all three theories. *See* Compl. ¶ 17, 19, 23; Interv. Compl. ¶ 30.[3] We now examine each of these claims in turn.

## I.      Manufacturing Defect

To establish a manufacturing defect, a plaintiff must prove that: "(1) the product was defective and unreasonably dangerous; (2) the defective condition existed at the time the product left the defendant's control; and (3) the defective condition was the proximate cause of the plaintiff's injuries." *Deaton v. Robison*, 878 N.E. 2d 499, 501 (Ind. Ct. App. 2007) (citing *Coffman v. PSI Energy, Inc.*, 815 N.E.2d 522, 527 (Ind. Ct. App. 2004)). Defendants argue that

---

[3] Plaintiff asserts his manufacturing defect and failure to warn claims under the heading of Count 1—his "strict products liability claim" brought explicitly under the IPLA. He asserts defective design only in Count 2, his general negligence claim. As already noted, claims of general negligence against a manufacturer for an allegedly defective product are preempted by the IPLA. We therefore construe this claim as one for defective design—and thus negligence—under the IPLA. Since Plaintiff has asserted all three possible theories of liability under the IPLA, his Counts 3 and 4 alleging implied warranty breaches are duplicative, and we will not address them separately.

Plaintiff's claim fails because he has not produced sufficient evidence from which a rational jury could infer that a defect existed in the TriPac system. Corp.'s Br. 9.

## A. The direct evidence

Plaintiff's case that the APU system installed in his truck was defective is wholly unsupported by any objective or expert evidence. The evidence designated by Plaintiff includes a deposition by Mr. McClellon himself. His testimony, if taken as true for the purposes of this motion, establishes that he suffered a burn from placing his feet near the heater vent. McClellon Dep. 38. But the mere fact of injury, of course, is insufficient: "It is axiomatic that in order to show that a product is defective, the plaintiff must be able to point to a defect." *Ford Motor Co. v. Reed*, 689 N.E.2d 751, 753 (Ind. Ct. App. 1997). Other than asserting that the burn was unexpected—a "spiritual thing," in his words—and that the heater had failed to warm up his cab the previous evening, Mr. McClellon himself observed no defect in the system linked to his burning injury. Mr. McClellon asserts that he had previously registered complaints via email with PTL about his malfunctioning system—albeit that he was too cold at night, not that the system was dangerous—but records of these messages do not appear in the evidence. *Id.* at 32–33. Moreover, we cannot consider his remarks that he had heard other drivers complaining about the APU system; those statements are hearsay and unsupported by any other admissible evidence.[4] *See generally Gunville v. Walker,* 583 F.3d 979, 985 (7th Cir. 2009) ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

---

[4] Mr. McClellon's deposition testimony on the subject was as follows:
    Q: Did you know any other truckers who had these TriPac units?
    A: Yes, sir.
    Q: What did they think of them generally?

The depositions and affidavits of experts who examined the TriPac system installed in Plaintiff's truck, portions of which are designated by both parties, uniformly conclude that the system had no discernible defects. Mike DeVriendt, the national accounts manager for Espar Climate Systems, inspected the unit and found that it had been set up correctly, with a "clean installation." DeVriendt Dep. 20.[5] He found that the system had registered no overheating codes in its memory, and he noted further that such self-generated records of overheating, once created, cannot be erased from the computer system. *Id.* at 30–31. Although he measured air exhaust temperatures near the floor-level vent to be slightly over 200 degrees Fahrenheit, he found nothing unusual or dangerous about those readings: "Those are perfect temperatures from what I would have to say." *Id.* at 67. Michael Mills, the maintenance manager for PTL, also inspected the system and found that it functioned properly. Furthermore, he testified that he has no knowledge that any of the 450 TriPac units used by the company's fleet had had a recorded malfunction or had injured an employee. Mills Dep. 6–9.  Engineer James Casassa was present for two inspections of the system; he likewise found that it was functioning normally and reported that an air vent discharge temperature of approximately 200 degrees was appropriate. Casassa Aff. 1.[6]

It is true, as Plaintiff reminds us, that the combined weight of this expert testimony does not conclusively banish any possibility that the APU system installed in Plaintiff's truck cabin was defective in a way that caused it to overheat and burn his feet on the day of the accident. It

---

A: Well, majority of them was having problem [sic] out of those 50 that was issued that day, you know, you run upon them on the road out there and they was complaining just like I was, you know, about they having problem [sic].  Either some of them would be the air conditioner, some would be the heater. McClellon Dep. 85–86.

[5] Mr. DeVriendt's deposition is designated by Plaintiff as his Exhibit B and by Defendants as their Exhibit D.

[6] In his Response, Plaintiff also points to the medical report of Dr. Gregory Gleis, M.D., which refers to transcripts of emails between third parties describing similar temperatures. *See* Pl.'s Ex. D at 10. As we note below, *see* § III *infra*, these portions of the report are inadmissible hearsay.

appears that the first expert inspection was on October 19—sixteen days after the accident; none of the three experts could conclusively determine that the unit they inspected was the one that had been installed in Plaintiff's truck on October 3. *See* Mills Dep. 6. Nor, of course, does considerable evidence of a machine's normal functioning preclude the possibility that on one isolated occasion a latent defect caused it to function abnormally. But a plaintiff's burden in proving a manufacturing defect is not satisfied by poking holes in the authoritativeness of the defendants' witnesses. He must produce *evidence* of a defect that would support a reasonable juror's inference in his favor, not merely point to the abstract possibility of one; the eyewitness and expert testimony in the record falls far short of doing so—in fact, it cuts sharply in the other direction.

## B. *Res ipsa loquitur*

We are left, then, with this bare set of factual assertions: Plaintiff suffered an injury, and his injury was caused by standing next to the TriPac system's heating vent. He must ask a fact-finder to infer from the injury and its surrounding circumstances that it must have been caused by a manufacturing defect in the system. In other words, he must rely on the principle of *res ipsa loquitur*. The Defendants rejoin that Indiana law categorically disallows such an inference without supportive expert testimony. "In essence, McClellon's argument is that *because* he was injured, the TriPac system *must* be defective. To accept this premise requires a leap of logic . . . . Under Indiana law, negligence cannot be inferred from the mere fact of an accident." Corp.'s Br. 11 (citing *Wright Corp. v. Quack*, 526 N.E.2d 216, 217–218 (Ind. Ct. App. 1988)). While the Defendants have oversimplified the law, we conclude that, even if *res ipsa loquitur* may be properly applied to products liability suits in rare circumstances, the facts do not permit its application here.

12

In its classic form *res ipsa loquitur* is a rule of evidence consisting of two core elements. "First, the doctrine recognizes that under certain rare instances, common sense alone dictates that someone was negligent. Second, the doctrine requires that the injuring instrumentality be in the exclusive control of the defendant at the time of injury." *Whitted v. Gen. Motors Corp.*, 58 F.3d 1200, 1207 (7th Cir. 1995). Obviously, then, *res ipsa* fits poorly into the realm of strict products liability, in which the core issue is the existence of a manufacturing defect rather than the defendant's negligence—and the injury-causing instrumentality is, by definition, under the control of the plaintiff rather than the defendant at the time of the injury. Indiana courts have recognized as much, noting that "products liability and the doctrine of *res ipsa loquitur* are antithetical" in principle because the element of defendant's control is so crucial to the *res ipsa* inference. *Ford Motor Co. v. Reed*, 689 N.E.2d 751, 754 (Ind. Ct. App. 1997). "Indiana strongly embraces the *res ipsa* doctrine only if the injuring instrumentality is within the exclusive control of the defendant at the time of injury." *SCM Corp. v. Letterer*, 448 N.E.2d 686, 689 (Ind. Ct. App. 1983).

Despite these barriers to its applicability in its pure form, however, both the Seventh Circuit and Indiana courts have held that in limited circumstances, circumstantial forms of proof conceptually similar to *res ipsa* may enable a claim to reach a jury. While cautioning that "the mere fact that an accident occurred" is never sufficient to support a products liability claim, the Seventh Circuit, applying Indiana law in *Whitted v. General Motors Corp.*, 58 F.3d 1200 (7th Cir. 1995), surveyed the practice of other state courts and concluded that "theories analogous to *res ipsa loquitur*" may be used to prove manufacturing defects under certain conditions. 58 F.3d at 1207–1208. "Using the doctrine . . . [a] plaintiff may introduce direct evidence from an eyewitness of the malfunction, supported by expert testimony explaining the possible causes of

13

the defective condition." *Id.* Plaintiffs may also "introduce inferential evidence by negating other possible causes." *Id; see also Welge v. Planters Lifesavers Co.*, 17 F.3d 209, 211 (7th Cir. 1994) (citing *res ipsa* as a manifestation of the "broader principle" that "an accident can itself be evidence of liability").

In *Ford Motor Co. v. Reed,* 689 N.E.2d 751 (Ind. Ct. App. 1997), the Indiana Court of Appeals affirmed the denial of summary judgment against plaintiff car owners, applying similar principles. The plaintiffs in *Reed* had been the owners of a Ford car for five months when the car burst into flames one night while parked in the family's garage. In holding that the plaintiffs' evidence was sufficient to support an inference of manufacturing defect, the court reasoned that the plaintiffs had "all but eliminate[d] every possibility but a defect." 689 N.E.2d at 755. Evidence indicated that the fire originated within the dashboard console—an area of the car which owners do not ordinarily access. Further, an expert opined that a fire of that nature was likely to have originated from a wiring defect in the console. *Id.* In *Reed,* the fact that there was a fire served as circumstantial evidence that there was a defect, and the presence of additional supporting evidence mitigated the lack of direct evidence and weighed against a grant of summary judgment. In *Gaskin v. Sharp Elecs. Corp.*, 2007 WL 2819660 (N.D. Ind. Sept. 26, 2007)**,** the court likewise relied on the means of circumstantial proof outlined in *Whitted* to sanction a strict products liability claim unsupported by direct evidence of a defect. 2007 WL 2819660, at *5–7.  There, a fire broke out in the plaintiffs' bedroom, and plaintiffs claimed to have seen that their new television was the ultimate source of the flames. Although an expert witness was unable to reach any positive conclusions about the origins of the fire, he inspected other possible culprits around the room (outlets and other appliances) and ruled them out as the ultimate cause. *Id.* at *7. The court reasoned that the expert's elimination of alternatives, coupled

14

with the eyewitness report that the television was on fire, was sufficient to support an inference that the television was defective. *Id.*

Here, Plaintiff argues that the circumstances of his injury would warrant a jury in making a similar inferential step. Starting with the undisputed principle that a "lay person can draw inferences from the facts and circumstances of an occurrence based upon their common sense and life experience," Plaintiff urges that "it is well within the understanding of a lay person that a sudden blast of essentially scalding hot air is sufficient to cause Plaintiff's injuries." Pl.'s Resp. 4–5. In support of this proposition, Plaintiff contrasts "the fact that human skin receives a significant and serious burn at 138° [Fahrenheit]" with the various inspection reports showing outlet temperatures exceeding 200 degrees.[7] *Id.*

Plaintiff's argument fails for two reasons. First, its key logical link—that the TriPac system was producing temperatures dangerous to human skin—is completely unsupported by the kind of expert evidence that would be necessary to make it credible. Plaintiff has put forth no expert opinion that the temperatures produced by the system were dangerous. In fact, the designated evidence contains statements by three experts, all of whom inspected Plaintiff's cabin after the accident and all of whom found it to be functioning normally; two experts, Mr. DeVriendt and Mr. Casassa, specifically noted that air outlet temperatures of greater than 200 degrees are considered normal. *See* DeVriendt Dep. 67; Casassa Aff. 1. Plaintiff's bare assertion that human skin burns at 138 degrees—buttressed by no citation of any sort—is not the sort of

---

[7] In support of his argument, Plaintiff relies extensively on the Indiana Court of Appeals case *Smith v. Beaty,* 639 N.E.2d 1029 (Ind. Ct. App. 1994), particularly its affirmation that "causation in a negligence case need not always be proven by expert testimony." 639 N.E.2d at 1034. As Defendants point out, the citation is inapt. The dispute here centers not on causation, but the existence of a defect. In *Smith,* the court reasoned that a lay juror could infer from the uncontroverted testimony of an auto accident victim that the collision caused his injuries. *Id.* If the existence of a defect here were established, *Smith* might buttress Plaintiff's argument that the causal chain between defect and injury should be obvious without expert testimony. Neither *Smith* nor the principles for which it is cited, however, help Plaintiff answer the antecedent question of whether a manufacturing defect existed.

unimpeachable background fact of which we could properly take judicial notice. *See generally* Fed. R. Evid. 201(b)(2).[8] Indeed, common sense belies any notion that exposure to 200-degree air will always and everywhere burn the skin independent of context; as Defendants note, most of us have stood near open ovens producing far higher temperatures without experiencing skin burns.

The Seventh Circuit in *Whitted* held that a plaintiff may establish circumstantial proof by, among other things, presenting "expert testimony explaining the possible causes of the [putative] defective condition" or outlining what makes a certain product defective. 58 F.3d at 1207–1208. Here, expert testimony showing that temperatures in a certain range are abnormal or dangerous—or even that a skin burn of the type suffered by Plaintiff is consistent with a malfunctioning heater—might have met this burden, but Plaintiff failed to present anything of the sort. *Cf. Reed*, 689 N.E.2d at 755 (Plaintiff's expert produced evidence that the physical condition of wiring taken from a car in the aftermath of a fire was consistent with the theory that the wiring was defective in a fashion that would have caused the fire). A plaintiff may also avail himself of *res ipsa* by eliminating alternative causes to a great enough extent to warrant the inference that the accident would not have occurred but for a defective condition. *See Whitted*, 58 F.3d at 1207. The record contains a photograph of the interior of the truck cabin, but Plaintiff has developed no arguments or evidence that would lead a juror to the conclusion that only a defective TriPac system could explain his injury. *Cf. Gaskin*, 2007 WL 2819660, at *7 (Plaintiff's expert eliminated possible alternatives to a television's electrical defect as causes of a bedroom fire).

---

[8] Plaintiff's assertion does not appear to be of the kind that can be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned," particularly since Plaintiff has not provided us with any such sources. At any rate, Plaintiff's assertion only obfuscates the key issue: whether *air* in the temperature range produced by the heater actually raises *skin* temperature to the level Plaintiff claims is dangerous.

Res ipsa loquitur, under the proper conditions, literally enables the injury to "speak for itself." *See Shull v. B.F. Goodrich Co.*, 477 N.E.2d 924, 926 (Ind. Ct. App. 1985). It is a rule of evidence that runs counter to a plaintiff's ordinary obligation to provide affirmative proof of liability, and as such its use is limited; an injury may only speak for itself when the message it delivers is nearly unmistakable. *See Letterer,* 448 N.E.2d at 690. Indiana law opens the door to indirect proof in strict products liability, but only if the circumstances of the injury are buttressed by some additional evidence that shortens the inferential leap. Here, Plaintiff's paucity of proof would force a jury to bridge a veritable chasm to arrive at his desired conclusion. This is too much to ask, and strains the doctrine of *res ipsa* beyond its breaking point.

Second, and more broadly, Plaintiff's argument fails to show that the TriPac system was in a "defective condition *unreasonably* dangerous." Ind. Code § 34-20-2-1 (emphasis added). Under the limited conditions in which it is applicable, *res ipsa loquitur* reflects the commonsense intuition that certain injuries ordinarily do not happen in the absence of fault—or here, a defect. *See generally Rector v. Oliver*, 809 N.E.2d 887, 889–890 (Ind. Ct. App. 2004). The strength of that intuition rises or falls dramatically in accordance with the circumstances of the accident. In a products liability case, it depends especially on the nature of the product. A non-defective car does not ordinarily catch fire parked in a garage overnight, *cf. Reed*, 689 N.E.2d at 755, nor does a non-defective television ordinarily burst into flames in an unoccupied bedroom, *cf. Gaskin*, 2007 WL 2819660, at *7. In *Reed* and *Gaskin*, the products at issue caused injury in abnormal fashion, and in a means disconnected from risks that might be ordinarily associated with their usage—such as collision for a car or electric shock from an operating television. The TriPac system, by contrast, is explicitly designed to produce heat, and the uncontroverted expert testimony tells us that producing exhaust vent temperatures in the range of 200 degrees is

normal. While a reasonable juror might be able to infer that a children's toy, for instance, was defective and unreasonably dangerous from the mere fact of a burn injury, to infer that a heater is unreasonably dangerous on these facts would require either more evidence or more expert guidance. *Cf. Kucik v. Yamaha Motor Corp.*, 2010 WL 2694962, at *6 (N.D. Ind. July 2, 2010) (distinguishing *Reed* and finding *res ipsa* inapplicable where plaintiffs sought to infer a motorcycle engine valve defect from the facts of a high-speed accident). The line between speculation and reasoned inference can be difficult to discern, but the sheer weakness of evidence supporting Plaintiff's manufacturing defect theory here leaves us little choice but to conclude that there are simply not enough facts from which inferences could be drawn in his favor.

## II.    Defective Design and Failure to Warn

Plaintiff's failure to establish a basis for his manufacturing defect claim also dooms his alternate theories of liability under the IPLA. Since he has marshalled insufficient evidence to warrant a trial on a strict liability theory, it only stands to reason that he will fall short in establishing claims whose success requires a plaintiff to show not only that injury was caused by a defective and unreasonably dangerous product, but that a defendant acted negligently in introducing the product into the stream of commerce.

To establish a prima facie case under a design defect theory, a plaintiff must show that: (1) the manufacturer placed into the stream of commerce a defectively designed, unreasonably dangerous product; (2) a feasible safer alternative product design exited; and (3) the product defect proximately caused the plaintiff's injury. *Barnard v. Saturn Corp.*, 790 N.E.2d 1023, 1032 (Ind. Ct. App. 2003). Unlike in strict liability, a claimant must also show that the "manufacturer

or seller failed to exercise reasonable care under the circumstances in designing the product." Ind. Code § 34-20-2-2; *Lapsley v. Xtek, Inc.*, 689 F.3d 802 (7th Cir. 2012) (affirming that the reasonable care standard imports "general negligence principles"). Plaintiff's evidence establishes neither that the TriPac system was defectively designed or unreasonably dangerous, nor that a feasible safer alternative product design existed.

"[T]o allow a plaintiff to establish the existence of a design defect by his mere assertion is ludicrous." *Whitted*, 58 F.3d at 1206. If the experts' testimony that the TriPac system in Plaintiff's cabin functioned normally seriously diminishes the viability of a manufacturing defect claim, it is positively fatal to a design defect theory. While Plaintiff could ask a jury to speculate that the system, despite its normal functioning when inspected, malfunctioned on the date of the accident in a manner that escaped detection, a design defect is a systematic flaw that imputes negligence to the product's manufacturer and designer. *See, e.g.*, *Baker*, 799 N.E.2d at 1142–1145. Where a plaintiff is unable to point to a concrete defect in the first place, it is doubly unreasonable for him to ask a jury to conclude that a defendant is at fault for not having noticed and corrected the putative flaw. Here, Plaintiff's failure to establish the basis for an inference that the TriPac system was defective forecloses the theory that the product was negligently designed.

Additionally, after pointing to a design flaw, a plaintiff must also demonstrate the feasibility of a superior design alternative. "Indiana requires the plaintiff to show that another design not only could have prevented the injury but also was cost-effective under general negligence principles." *Whitted*, 58 F.3d at 1206 (citing *Pries v. Honda Motor Co., Ltd.*, 31 F.3d 543, 546 (7th Cir. 1994)). A plaintiff can meet this burden by presenting expert testimony comparing alternative designs, or by introducing objective data tending to show the viability or

superiority of alternatives. *See Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 901 (7th Cir. 1994). None of Plaintiff's designated evidence meets this burden or even touches on the issue of other designs, and Plaintiff scarcely argues in his briefing that he has satisfied this criterion. In his response to this motion, Plaintiff does assert: "A finder of fact could conclude that given the high temperatures testified to by Defendants' inspector Michael DeVriendt, both at the heat exchanger and at the outlet vent, it would have been reasonable to either (1) relocate the vent and/or (2) warn of the potential for gusts of scalding air." Pl.'s Resp. 5–6. This argument fails for two separate, and equally sufficient, reasons. First, it would be entirely *unreasonable* for a juror to infer from Mr. DeVriendt's testimony that the design of the system was faulty; as an expert, he opined that the very opposite was true, finding the system's design and placement normal and the heater temperatures not noteworthy.   DeVriendt Dep. 20, 67. Second, merely suggesting that the vent be "relocated" hardly meets Plaintiff's burden of demonstrating the viability of an alternative design. *Cf., e.g., Baker,* 799 N.E.2d at 1142–1143 (plaintiff's expert discussed advantages and disadvantages of alternative designs).

Plaintiff's failure to establish a basis for inferring the existence of a defect rendering the TriPac system unreasonably dangerous is likewise fatal to his failure to warn claim. The existence of a duty to warn is a question of law to be decided by the court. *See Ford Motor Co. v. Rushford*, 868 N.E.2d 806, 810 (Ind. 2007). "Absent proof of a dangerous instrumentality, or proof of a defect or improper design making an otherwise harmless instrument dangerous, there is no duty to warn of product connected dangers." *Am. Optical Co. v. Weidenhamer*, 457 N.E.2d 181, 187 (Ind. 1983). A defendant's fault in distributing a product with a known or knowable defect is logically inseparable from a defendant's fault in failing to give proper warning of such a defect. Where a plaintiff cannot meet his burden of establishing that there was anything wrong

with the product, recovery for failure to warn is impossible. *See Rogers v. Ford Motor Co.*, 952 F. Supp. 606, 617 (N.D. Ind. 1997) (explaining that "it is axiomatic that there can be no duty to warn where no design defect has been shown"). Although it appears to be undisputed that Plaintiff did not receive the safety manual for the TriPac system or any other specific warning from Defendants or his employer about its proper use, the sufficiency of Defendants' warnings lacks legal significance unless it is first established that a flaw existed giving rise to a duty to warn.

## III.   Conclusion

Defendants have aptly summarized their position in seeking summary judgment as follows:

> Thermo King does not dispute that a lay jury could infer from McClellon's testimony that his alleged injuries were caused by a "sudden burst of hot air" from the TriPac System . . . . [A] lay jury *cannot* infer in the absence of expert testimony that the purported "sudden burst of hot air" was caused by a "defective condition" in the TriPac system which rendered [it] "unreasonably dangerous."

Corp.'s Reply 6 (emphasis original). We agree. Plaintiff has not introduced any direct evidence of a defect in Defendants' product. Although Indiana law in some cases permits defects to be proved through circumstantial evidence, Plaintiff's argument here amounts to a request that a jury premise liability on the mere fact of injury—in circumstances that do not support such an inferential leap. Defendants' motions for summary judgment are therefore GRANTED.

Defendants have also moved to strike elements of the report of Dr. Gregory Gleis, M.D., on the basis that he is an undisclosed expert witness and large portions of his report are hearsay. We have declined to consider those hearsay portions of his report in reaching our decision; the admissible portions of his report demonstrated the existence of Plaintiff's injuries but were

21

irrelevant to the question of products liability. Defendants' Motion to Strike Hearsay [Docket No. 112] is accordingly GRANTED.

   IT IS SO ORDERED.

Date:  12/13/2013 

         SARAH EVANS BARKER, JUDGE
         United States District Court
         Southern District of Indiana

Distribution:


Matthew Reed King
FROST BROWN TODD LLC
mking@fbtlaw.com


Timothy Loren Karns
FROST BROWN TODD LLC
tkarns@fbtlaw.com


J. Kendrick  Wells, IV
FROST BROWN TODD LLC.
kwells@fbtlaw.com


Kenneth Allen Ewing
LAW OFFICE OF THE LIBERTY MUTUAL GROUP
kenneth.ewing@libertymutual.com


Christopher L. Valleau
NEILSEN, ZEHE & ANTAS, P.C.
cvalleau@nzalaw.com


Christy H. Schaefer
NIELSEN, ZEHE & ANTAS. P.C.
cschaefer@nzalaw.com


Joel Samuel Paul
RAMEY & HAILEY
joel@rameyandhaileylaw.com


Richard D. Hailey
RAMEY & HAILEY
rich@rameyandhaileylaw.com